**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

Werner Wolfgang Rummer,     )
                                    )
            Plaintiff,          )    **REPORT AND RECOMMENDATION**
                                    )    (Not for Publication)
      vs.                  )
                                    )
State of North Dakota, et. al.,     )
                                  )    Case No. 1:12-cv-020
          Defendants.    )

---

Before the court is a Motion for Summary Judgment filed by defendants Robyn Schmalenberger, Kathy Bachmeier, Jessica Wilkens,[1] and Dr. John Hagan. The motion has been referred to the undersigned for preliminary consideration. For the reasons set forth below, it is recommended that the motion be granted.

## I.    <u>BACKGROUND</u>

Plaintiff Werner Wolfgang Rummer[2] is an inmate at the North Dakota State Penitentiary ("NDSP") in Bismarck, North Dakota. He is serving a life sentence for murder.

On March 8, 2012, Rummer initiated this action under 42 U.S.C. § 1983 by submitting a complaint that included thirty-two "claims" against fifteen defendants. (Doc. No. 3). Following initial screening pursuant to 28 U.S.C. § 1915A, Rummer was allowed to proceed only with his claims of retaliation and deliberate indifference to his medical needs and only against former NDSP

---

[1] Plaintiff named defendant "Jessica Wilkin" in his complaint. Defendants' submissions indicate that defendant's correct name is "Jessica Wilkens," and the court will refer to her as such.

[2] Plaintiff has referred to himself as "Werner Rummer" in the filings in this case. Most, if not all, of the NDSP records and medical records submitted refer to plaintiff as "Werner Kunkel." The court will refer to plaintiff as "Rummer."

Warden Robyn Schmalenberger,[3] Dr. Hagan, Jessica Wilkens, and Kathy Bachmeier, all in their individual capacities. (Doc. Nos. 21, 24).[4]

Defendants filed a motion for summary judgment. (Doc. No. 68). After being granted several lengthy extensions, Rummer filed his response to which defendants have replied. (Doc. Nos. 79-80, 87). The motion has been fully briefed and is ripe for review.

The record evidence in this case is voluminous and not subject to easy summarization. Hence, it will be addressed in connection with the discussion of the individual claims.

## II.    SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. Id.

The moving party has the burden to show the basis for its motion and identify the portions of the record that demonstrate the absence of a genuine issue of material fact. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P 56(c). To avoid summary judgment, the nonmoving party must respond with

---

[3] Schmalenberger was Warden of the NDSP at the time the alleged retaliation occurred. She resigned her position as NDSP Warden in February 2014.

[4] The only personally-named defendant in Rummer's retaliation claim is Schmalenberger. The other defendants are named in the deliberate indifference claims. Since Schmalenberger is not named in the deliberate indifference claims the discussion set forth below for these claims focuses upon the three defendants who were named. Schmalenberger would have no liability in any event with respect to the deliberate indifference claims since there is no evidence she was involved in any of the matters that Rummer complains about and respondeat superior is not a basis for liability under § 1983.

evidence that shows a genuine issue of material fact.  Torgerson, 643 F.3d at 1042 (citing Celotex Corp., 477 U.S. at 324); Fed. R. Civ. P 56(c).  The evidence and the inferences which reasonably may be drawn from the evidence must be viewed in the light most favorable to the nonmoving party. Young v. Builders Steel Co., 754 F.3d 573, 577 (8th Cir. 2014).  However, the non-moving party may not merely rely on unsupported, self-serving allegations to avoid summary judgment.  Davidson & Associates v. Jung, 422 F.3d 630, 638 (8th Cir. 2005).

## III.    DELIBERATE INDIFFERENCE CLAIMS

### A.    Summary of deliberate indifference claims and defendants

Rummer claims he suffers intolerable pain in his neck and shoulders caused by damage to his cervical spine that he contends resulted from a slip and fall on ice while walking to his prison job at Rough Rider Industries on March 6, 2010.  At issue here are his claims that three of the personally named defendants have been deliberately indifferent to his medical needs by (1) delaying the treatment for cervical issues in his neck, and (2) failing to provide adequate medication to alleviate his neck and shoulder pain.

The fact Rummer suffers some pain and discomfort in his neck and shoulder area is not disputed by defendants.  What is disputed, however, is the degree of pain and discomfort being claimed as well as the allegations of deliberate indifference in providing medical care for it.

Also, while the cause of Rummer's cervical problems is not directly at issue in this case, defendants believe that the neck and should pain that Rummer now claims is most probably caused by degenerative problems in Rummer's cervical spine and/or a soft tissue injury is of questionable origin.  They contend that any discomfort Rummer now suffers is qualitatively no different than what Rummer suffered for years leading up to the time period at issue in this case and that was

3

relieved, at last temporarily, by a surgery on Rummer's cervical spine in February 2010, which was approximately a month before the alleged slip-and-fall. Defendants also contend that, when Rummer first started complaining about a reoccurrence of neck pain in September 2010, he told one of the prison's nurses that the pain had returned after he had been lifting weights. (Doc. No. 80, Ex. P-120).

When Rummer's neck and shoulder discomfort returned, Rummer claims that his pain was now of such intensity that he was "writhing in his cell" and being subject to torture worse than Senator John McCain had to endure while he was in captivity. (Doc. No. 80. ¶¶'s 11, 61-62). Notably, this coincides with two things. The first was Rummer being placed in administrative segregation in August 2010 for a disciplinary issue where he remained until 2013 because of additional disciplinary problems. The second was his efforts throughout much of the time period in question to sue the NDSP in state court for the alleged slip-and-fall. (Doc. Nos. 80, Exs P-128, P-142A, P142B, P-143, P-161A, P-161B).

In the § 1915A screening, the court concluded Rummer was prohibited from proceeding with his deliberate indifference claims against the State of North Dakota, the NDSP, and the individually named defendants in their official capacities because the claims were barred by the Eleventh Amendment. However, as noted earlier, the court did permit the deliberate indifference claims to go forward as to Dr. John Hagan, Jessica Wilkins, and Kathy Bachmeier in their individual capacities.

Dr. Hagan is the in-house physician at the NDSP. (Doc. No. 69-2, p. 1). He is a state employee.

Wilkins is the present Director of Nursing at the NDSP and a registered nurse. Wilkins

assumed her position as Director of Nursing in October 2010, which is shortly after Rummer began complaining about his medical treatment insofar as this action is concerned. As Director of Nursing, Wilkins is responsible for coordinating daily operations of the medical department, overseeing operation of the medical department, and assessing the health care needs of the inmate population. (Doc. No. 69-6, p.1).

Bachmeier was the Director of Medical Services for the North Dakota Department of Corrections and Rehabilitation (DOCR) during a significant part of the time covered by this action. In that position, she oversaw all of the medical departments of the DOCR's correctional facilities including the NDSP. Her primary duties were to assist in arranging for medical evaluations and treatment for inmates if they could not receive treatment in the proximity or within the scope of services provided by the medial departments. Bachmeier has a Masters of Science Degree and is also a registered nurse. (Doc. No. 69-12, pp. 1-2). Bachmeier retired from her position on May 31, 2012, which is about mid-way through the time period relevant to this action.

**B.** **Governing law**

The Eighth Amendment's guarantee against cruel and unusual punishment is violated when prison officials exhibit deliberate indifference to an inmate's serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104 (1976); Popoalii v. Correctional Med. Services, 512 F.3d 488, 499 (8th Cir. 2008). To prevail on a claim of constitutionally inadequate medical care, an inmate must prove both an objective and a subjective component: (1) that the inmate suffered from an objectively serious medical need and (2) that prison officials actually knew of the need and deliberately disregarded it. Jackson v. Buckman, 756 F.3d 1060, 1065 (8th Cir. 2014).

To be objectively serious, a medical need "must have been 'diagnosed by a physician as

requiring treatment' or must be 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" Id. (quoting Scott v. Benson, 742 F.3d 335, 339-40 (8th Cir. 2014)). Deliberate indifference requires a showing of a mental state akin to criminal recklessness–"the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994); see Jackson, 756 F.3d at 1065. Deliberate indifference is "more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." Popoalii, 512 F.3d at 499 (quoting Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995)). Consequently, medical malpractice alone does not amount to deliberate indifference. Jackson, 756 F.3d at 1065-66. "An inmate must demonstrate that a prison doctor's actions were 'so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care.'" Id. at 1066 (quoting Dulany v. Carnahan, 132 F.3d 1234, 1240-41 (8th Cir. 1997)).

"When [an] inmate alleges that a delay in medical treatment rises to the level of an Eighth Amendment violation, the objective seriousness of the deprivation should also be measured by reference to the *effect* of delay in treatment." Laughlin v. Schriro, 430 F.3d 927, 929 (8th Cir. 2005) (italics in original; quotation and internal quotation marks omitted). "To establish this effect, the inmate must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." Id. (quotation and internal quotation marks omitted).

C. **Discussion**

1. **Rummer's history of chronic neck and arm pain predating mid-2010 and his February 2010 neck surgery**

Rummer's complaints of delay in treatment and failure to prescribe adequate pain medication

span the time period from mid-2010 to the filing of defendants' motion for summary judgment in early 2014. Some background with respect to what occurred earlier, however, is important for purposes of context.

Rummer had history of chronic left shoulder and arm pain extending back a number of years prior to 2010. Eventually, the NDSP medical department, at the recommendation of Dr. Hagan, sent Rummer to see an outside neurosurgeon, Dr. Spagnolia, on December 11, 2008. To address the issue, the first thing that Dr. Spagnolia tried was a nerve block that provided only temporary relief. (Doc. No. 69-3, p. 1).

When Rummer failed to get lasting relief from the nerve block, he was returned to see Dr. Spagnolia on April 7, 2009. At that point, Rummer was also complaining of issues in his wrist and forearm. Because of the possibility that carpal tunnel could be causing pain to radiate up into his arm as well as Rummer's other symptoms, he was scheduled for carpal tunnel surgery in his wrist that took place on June 18, 2009. (Id.).

When the carpal tunnel release failed to provide relief for Rummer's neck and shoulder pain, a new MRI was obtained on October 30, 2009, and he was returned to see Dr. Spagnolia on December 11, 2009. At that time, Dr. Spagnolia's evaluation noted that the new MRI showed some narrowing of the cervical spaces with the C6 nerve being a problem along with possibly a nerve impingement at the C7 level. Dr. Spagnolia recommended "posterior foraminotomy surgery noting that pain management is difficult in the prison system." (Id.).[5]

A preoperative physical conducted by Dr. Hagan on January 27, 2010, noted "chronic neck

---

[5] A foraminotomy is a surgical procedure to enlarge a space in the bones of vertebrae through which a nerve emanating from the spinal column passes to take the pressure off it, *i.e.*, decompress a "pinched nerve." See www.nlm.nih.gov/medlineplus/ency/article/007390.htm (last visited September 19, 2015). In his briefing, Rummer continually refers to his having suffered a crushed spinal cord; there is no evidence of that.

& back pain" and the upcoming surgery. Dr. Hagan continued Rummer on baclofen, which he was prescribing for Rummer's chronic pain along with amitriptyline. (Id., p. 2; Doc. No. 69-4).

Dr. Spagnolia conducted a C5-C6 cervical foraminotomy on February 1, 2010, specifically to address a left C6 nerve radiculopathy. (Doc. Nos. 69-2, ¶ 4; 80, Exs. P-103 to P-104). Following the surgery, Rummer reported almost complete relief from his arm pain and the fact that he was happy with results. (Doc. Nos. 69-2, ¶ 5; 80. Ex. P-105).

There are several things that are noteworthy about the history that predates Rummer's current complaints. First, the NDSP generally, and Dr. Hagan in particular, had been making extensive efforts over a period of several years to deal with Rummer's complaints of chronic shoulder and upper arm pain, including, ultimately, trying first a nerve block, then carpal tunnel surgery, and ultimately a cervical foraminotomy. The latter was successful for a period of time until something further happened.

Second, the evaluative process taken by Dr. Hagan prior to Rummer being referred to a specialist and then later having surgery is, for the most part, the same process that Dr. Hagan followed during the later time periods that Rummer is complaining about. And, no different from what the non-prison population experiences in terms of medical care, this all took time, particularly to get into see a specialist for an evaluation and then to be scheduled for surgery.

Second, Rummer was prescribed baclofen (20 MG twice daily) and amitriptyline (100 MB once daily) to provide some palliative relief for the chronic pain in his neck and shoulder and lower back during this early period. And, during the time frames that follow, these two medications were continued throughout the entire time period at issue in this case. Rummer does not dispute this, but claims that baclofen is a muscle relaxant that was prescribed for his lower back issues and that

amitriptyline is an antidepressant. Rummer has not presented any medical evidence, however, to refute Dr. Hagan's explanation that both medications can provide a modicum of relief for some types of pain. See also www.nlm.nih.gov/medlineplus/druginfo/meds/a682530.html (last visited) September 16, 2015 (baclofen provides pain relief and improve muscle movement while acting as a muscle relaxant); www.webmd.com/drugs/2/drug-8611/amitriptyline-oral/details (last visited) September 16, 2015) (amitriptyline, while primarily an anti-depressant, is also prescribed for nerve pain). Also, while Rummer appears to now deny this, Dr. Hagan's notes of an examination in 2012 that will be discussed in more detail later reflect that Rummer acknowledged he did get some relief with the baclofen and, when Rummer reported it did not last throughout the entire day, Dr. Hagan ordered that an additional dosage be given.

In short, during the entire time period that follows (except, perhaps, for a couple of instances in which Rummer's prescriptions may have run out and there was some delay in their being refilled), Rummer was continually being provided some medication for his chronic pain and that the different drugs, injections, and surgical procedures that were attempted to provide him more relief during the time period in question were all in addition to that.

A third item of significance is that Rummer was prescribed hydrocodone, a narcotic, for a short period of time after he returned to the NDSP following his February 2010 neck surgery to address any post-surgery pain. (Doc. No. 69-4, p. 1). The same is true for the several procedures that were later performed during the time period in question. In other words, the NDSP did not follow a policy of never administering narcotics for pain relief. Rather, the policy was generally not to prescribe narcotics for the management of long-term chronic pain, given the problems associated with prescribing narcotics in a prison setting, and instead to: (1) use other formularies and/or

injections to provide palliative relief; and (2) consider treatment that might get to the root of the pain problem when deemed medically prudent, such as surgical intervention.

### 2. Rummer's alleged fall on ice and treatment for a knee injury

According to Rummer, he slipped and fell on ice while walking outside to his prison job at Rough Rider Industries on March 6, 2010. (Doc. No. 8, pp. 20-22). (Id.) Rummer states he thought his injuries would heal without treatment and this was the reason why he did not seek immediate medical attention.

Approximately six weeks later, on April 18, 2010, Rummer made his first request for medical attention purportedly related to his slip and fall, which was that his knee was retaining fluid. (Doc. Nos. 69-3, pp. 2-3; 79, p. 2; 80, ¶ 39 & Ex. P-108). On April 19, 2010, a registered nurse examined Rummer's knee and scheduled him for doctor call. (Doc. Nos. 69-2, ¶ 8; 80, Ex. P-108). On April 22, 2010, Dr. Hagan saw Rummer. (Doc. Nos. 69-2, ¶ 9; 80, Ex. P-109). Dr. Hagan diagnosed posttraumatic prepatellar bursitis, drained the fluid from Rummer's knee and directed Rummer to seek further treatment if his knee showed any sign of infection. (Id.).

On May 2, 2010, Rummer submitted a written inmate request (a "kite" in prison parlance) asking for treatment for a recurrence of fluid in his knee. (Doc. Nos. 80, ¶ 47; 87-16). On May 3, 2010, a nurse examined Rummer's knee and scheduled Rummer for doctor call. (Doc. Nos. 69-2, ¶ 10; 69-3, p.3). On May 6, 2010, Dr. Hagan examined Rummer's knee. Dr. Hagan was concerned about the risk of infection associated with repeated draining of the knee and referred Rummer to a specialist for evaluation of treatment options. (Doc. Nos. 69-3, p. 3; 80, Exs. P-110 to P-111).

On May 12 or 13, 2010, Rummer's knee was x-rayed. (Doc. Nos. 69-3, p. 3; 80, ¶ 51). On May 19, 2010, Dr. William D. Canham saw Rummer for an orthopedic consult and recommended

surgery to excise the bursa sac in his knee. (Doc. Nos. 69-3, p. 3; 80, ¶ 52). Dr. Canham saw Rummer for a pre-operation examination on July 21, 2010.

Dr. Canham performed the knee surgery on August 5, 2010. (Doc. Nos. 69-3, p. 4; 80, Exs. P-114A to P-114B, P-116). On August 18, 2010, Dr. Canham followed up after Rummer's surgery and the sutures were removed from Rummer's knee. (Doc. Nos. 69-3, p. 4; 80, ¶ 63).

Several things are of note with respect to the history of Rummer's knee problem. The first is that NDSP medical staff, including particularly Dr. Hagan, gave prompt attention to it, including making an outside referral to a specialist and providing surgery. Also, as already alluded to, Rummer was prescribed hydrocodone for a short period of time following his return to the NDSP to address any post-surgery pain. (Doc. No. 69-4, p. 1).

Finally, to keep the chain-of-events in perspective, Rummer was placed in administrative segregation on August 10, 2010, following a disciplinary hearing that resulted from his having been caught with several items of contraband during a search of his cell on July 30, 2010, that NDSP personnel believed may have been consistent with plans for escape. (Doc. Nos. 80, ¶ 57; 87-3, ¶ 3). In a separate claim addressed below, Rummer claims that the cell search was retaliatory.

     **3.**    **Rummer's complaint of neck and shoulder pain, his first examination by Dr. Hagan, and a followup examination on October 5, 2010 for which a previously ordered x-ray was not available**

On August 18, 2010, Rummer submitted a kite which stated, "When I fell and hurt my knee I think I may have done something to my neck because it's been hurting extremely bad. Now that the knee seems to have been fixed should maybe have Dr. Spagnolia examine me to see what's going on with my neck and shoulder." (Doc. No. 80, Ex. P-119). On August 24, 2010, Rummer was

seen by a nurse and put on doctor call.  (Doc. No. 69-3, p. 4).[6]

On September 7, 2010, Dr. Hagan saw Rummer.  (Doc. Nos. 69-2, ¶ 15; 69-3, p. 4; 80, Ex.

P-120).  Dr. Hagan's notes from the appointment state:

> S: Werner is seen today in the AS clinic.  He has just had right knee surgery for
> prepatellar bursitis.  He is doing better from this.
>
> He said he is having C6 radicular neck pain.  He states he fell on ice and that is how
> he got hurt.  He had shared with Denise in nursing that he was weight lifting again
> and had caused the injury at that time.  When I presented him with that information
> today, he denies that is true.
>
> He otherwise said his pain is the same as it was before he had surgery.  He is hopeful
> that something can be done.
>
> O:  On exam, exam is limited as the patient is in cuffs.  He has bilateral shoulder
> shrug that was normal strength and his is able to hold his head and turn his head in
> normal range of motion.
>
> A/P:  Probable recurrence of previous C-spine disease – at this point I will get a plain
> x-ray to be sure that the patient doesn't have significant hardware in place.  If not,
> I will then go ahead and order an MRI of the C-spine, at which time I will see him
> back.

(Doc. No. 80, Ex. P-120).

Dr. Hagan ordered the C-Spine x-ray that he wanted to determined whether an MRI should

be ordered  and Rummer was placed on the NDSP x-ray list for September 8, 2010.  (Doc. No. 69-2,

¶ 16; 80, Ex. P-121).  It appears now that no x-ray was taken on that date. (Doc. No. 69-3, p. 5).

On September 27, 2010, Rummer submitted an inmate request that stated, "Due to my neck

pain would you authorize me to have an orange card for a 2nd pillow.  Having trouble sleeping."

---

[6]  Rummer claims that he advised Dr. Hagan during his May 6, 2010 visit that he was experiencing stiffness
in his neck (but not pain at that point) and that Dr. Hagan's response was that "Let's worry about one problem at a time,
and today it's the knee" or words to that effect.  (Doc. No. 80, ¶ 48).  Dr. Hagan states that he has no recollection of
Rummer claiming stiffness in his neck during that visit and that it would have been mentioned in his notes had Rummer
complained about it.   (Doc. No. 87-1, ¶ 20).

(Doc. No. 80, Ex. P-122).  A nurse approved the request, and Rummer was given a second pillow on September 28, 2010.  (Doc. No. 80, Ex. P-123).

An appointment for Dr. Hagan to review Rummer's x-ray was set for October 5, 2010.  However, the x-ray report was not available.  (Doc. Nos. 69-2, ¶ 17; 80, ¶ 75).  Dr. Hagan's notes from that date state:

> Werner is set on my schedule today as a chart review.  My goal is to review his neck x-ray and make a determination as to whether or not he needs an MRI.  At the time of this review, the cervical x-ray report is not available.  As a result, I have asked to have it retrieved so I can review it.  At that time I will make that decision.

(Doc. No. 80, Ex. P-124).

It is during this September to October 2010, time frame that Rummer claims he first began complaining to NDSP staff, and Dr. Hagan in particular, that he was suffering intolerable pain in his neck and shoulder area.  More specifically, he asserts that, when he entered the room in AS for the September 7, 2010 exam, he begged Dr. Hagan to be returned to see Dr. Spagnolia because his neck was hurting worse than before the surgery.  He claims that Dr. Hagan scolded him, stating words to the effect:  "Here we fixed your neck all up nicely, now you went and screwed it up again!"  He also claims that he asked Dr. Hagan for something to relieve him from "tormenting pain" he claims he was suffering.  (Doc. No. 80, ¶¶ 66-67).

According to Rummer, he made similar complaints about his pain, when he returned to Dr. Hagan for his followup visit on October 5, 2010.  He claims he was "begging for help like a dog" and "screaming and complaining" about the severe pain, and that Dr. Hagan did not "lift a finger" to determine why the previously ordered x-ray was not available despite the passage of almost a month.  (Doc. No. 80, ¶ 75).

Dr. Hagan denies that he ever scolded Rummer about his neck injury or that Rummer

presented himself as being in intolerable pain on either September 7 or October 5 and that, while Rummer complained about pain in his neck, he described it as being similar to what was present prior to this February 2010 surgery and that on neither occasion did Rummer demand additional pain medication. Dr. Hagan also states that he did not ignore Rummer's complaints of discomfort, but rather concluded: that Rummer, at most, was suffering from chronic pain that was not intolerable; that Rummer was under prescription for medication to provide help with the chronic pain; and that he determined an x-ray should be obtained to further evaluate whether an MRI would be in order to see whether anything additional was going on. (Doc. No. 87-1, ¶¶ 25-28).

In summary, for the time period through October 5, 2010, the only evidence that Rummer was suffering from intolerable pain requiring immediate medical care and/or the administrative of powerful narcotics, much less that he communicated this to one or more of the personally named defendants, comes from Rummer's self-serving statements and declarations. There is no corroborating evidence - at least none that is not rank hearsay.

4. **The time period from when Dr. Hagan saw Rummer on October 5, 2010, to when he next saw Dr. Hagan on March 8, 2011**

It appears that the x-ray that Dr. Hagan ordered following the September 7, 2010 examination and that he asked to be retrieved for his review when it was not available on October 5, 2011, was never taken. And, as discussed later, there was no followup with the net result being that Dr. Hagan did not again seek to have the x-ray taken until March 8, 2011, some five months later, which was the next time he saw Rummer. Dr. Hagan states in his affidavit that, after the October 5 appointment, he sent an electronic referral to the ward clerk requesting that the x-ray report be retrieved and forwarded to him for review and that he relied upon this process to bring the matter back to his attention. (Doc. No. 69-2, ¶ 16). He denies he deliberately ignored the matter.

In the meantime, Rummer claims he made frequent, sometimes daily, requests for medical attention for his neck pain and for the MRI that he claimed Dr. Hagan had promised him in the form of: (1) numerous kites; (2) several grievances; and (3) verbal conversations with a number of different nurses whom he identifies by name, including defendant Wilkins. During these conversations with nurses, Rummer claims that he not only complained about his pain and the lack of followup treatment, but also that the nurses had responded to him verbally that Dr. Hagan had been made aware of his numerous complaints. (Doc. No. 80, ¶¶ 72-131).

Defendants and other NDSP personnel dispute almost all of this. They attest that, for the time period from October 5, 2010, to March 8, 2011, there is no record of <u>any</u> grievances having been submitted by Rummer and no record of most of the kites he claims he submitted. (Doc. Nos. 87-1, pp. 3-4; 87-2; & 87-4). NDSP personnel state that the only record of any complaints from Rummer during this time frame are five kites, copies of which are in the record. (Doc. Nos. 80, Exs. P-127 & P-129; 87-13 to 87-15). And, of these five kites , defendants point to the fact that three of them were for anti-dandruff shampoo, nasal spray, and antacids, which all were responded to and none of which said anything about pain or lack of treatment. (Doc. Nos. 87-13 to 87-15).

As for the remaining two kites that do reference neck and shoulder pain, defendants point to the fact that it was the second of the two that led Rummer to be seen by Dr. Hagan on March 8, 20ll. More particularly, this kite is dated February 23, 2011, and reads:

> Dr. Hagan - Med. Dept.
> Being that A.S. is very similar to being locked up in the infirmary, would you please consider prescribing me something sufficient for my incredible neck and shoulder pain? At least until I see Dr. Spagnolia? It hurts bad.

(Doc. No. 80, Ex. P-129). The "Response" portion of the kite form for this kite was filled out and states Rummer was "Placed on Dr. Call neck pain." (<u>Id.</u>). As discussed in more detail in a moment,

most likely this would have been the duty nurse who made this note.

In terms of what records the NDSP claims to have, this leaves only one other kite that references Rummer's complaints of neck pain and lack of treatment. This is the kite dated January 23, 2011, which reads:

> To      Dr. Hagan - Med Dept.
> Have run into a glitch with the nurses about my meds expiring - would you please renue [sic] them? Thanks. Also, have been waiting for 5 months now on this MRI for my horrible neck and shoulder pain. I know you're pissed about my falling on the ice but it wasn't my fault.

(Doc. No. 80, Ex. P-127). The response to this request, which appears to have been initialed by one of the duty nurses, is dated January 24, 2011 and states that "referrals" were sent for baclofen and amitriptyline, which were the two drugs being prescribed for Rummer's chronic pain as already discussed. (Id.). Further, a review of the NDSP's prescription log for Rummer indicates that renewals for these two pain prescriptions were issued the next day. (Doc. No. (Doc. No. 69-4).

Before addressing the significance of what took place between October 5, 2011 (when Dr. Hagan saw Rummer but was unable to review an ordered x-ray) and March 8, 2011 (when Dr. Hagan next sees Rummer and places a new order for an x-ray for the same purpose), the affidavit evidence submitted by defendants is that all requests for medical attention are routed to the nurse who is on duty for initial consideration and action, such as scheduling an appointment with a doctor, physician's assistance, or nurse or referring the matter to the pharmacy. The requests generally are not sent to Dr. Hagan - even those that are addressed to him. Also, they are not included in the medical record he reviews. Further, the same is true for any grievances over medical care. They are not forwarded to Dr. Hagan as a matter of course and he is only made aware of them if NDSP personnel seek a response. (Doc. Nos. 69-6, pp. 1-13; 87-1, pp. 1-4). Finally, in addition to the

affidavit evidence submitted by defendants, the documents in the record support that this was the flow of both inmate requests for medical care as well as any grievances over claimed lack of care.

As for the many kites and grievances that Rummer claims he submitted during this and the other time periods discussed below, they fall into three groups. The first are those that the NDSP agrees were sent and copies of these are included in the record. The second are those that Rummer claims he submitted for which there are no copies in the record and which the NDSP denies were submitted because it has no record of them. The third are copies of purported kites and grievances for which Rummer has supplied a copy, but which the NDSP claims also were never submitted because of the lack of record of them as well as the lack of any other corroborating information, such as the presence of a "received" stamp or a portion of the form having been completed by NDSP personnel. (Doc. Nos. 87-1, pp. 3-4; 87-2; & 87-4). Also, in addition to claiming that none of the kites or grievances in this third category were contemporaneously submitted, defendants suggest, at least implicitly, that they were created after-the-fact by Rummer to support not only this case but his attempts to seek recovery from the State for his slip and fall, which efforts were ongoing during most of the time period covered here. In support, they point to Rummer's failure to produce them during discovery and also contend that they should not be considered for that reason as well.

Turning then to what took place or what failed to take place during the period from October 2, 2010 to March 8, 2010, Rummer again has no independent corroboration that he was in fact suffering from intolerable and unrelenting pain. Also, his allegations that he made numerous, and sometimes daily, complaints of intolerable pain and about him not being referred for an allegedly promised MRI are suspect, to say the least, given that the NDSP has no record of any of the grievances and almost none of the kites and that there is no corroboration for any of the oral

conversations he claims he had with various members of the nursing staff. If these allegations were true, then it would mean that numerous members of the nursing staff were unwilling to schedule Rummer to be seen by Dr. Hagan after purportedly receiving these requests - contrary to what otherwise was their practice at other times as exhibited by the record. It would also mean that there was a massive failure on the part of the NDSP's records-keeping system or that numerous persons were involved in a conspiracy to either not make and retain records in circumstances in which they are normally made and retained or to destroy them.[7]

Nevertheless, there are two points that are troubling with respect to what the NDSP acknowledges took place during the time period now under consideration. The first is the lack of followup with respect to the x-ray that Dr. Hagan ordered following Rummer's September 7, 2011 examination that apparently was never taken - even despite Dr. Hagan again asking that it be retrieved for his review when it was not available on October 5, 2011. As noted earlier, Dr. Hagan states in his affidavit that he relied upon the system to make the x-ray available for his review. While this might be reasonable given the number of inmates that Dr. Hagan likely has to administer care for, defendants are vague about who, if not Dr. Hagan, was responsible for coordinating Rummer's care and following up on matters such as this. Also, somewhat troubling is why Rummer's January 24, 2011 kite, which the NDSP acknowledges was received, did not result in Rummer being scheduled to see Dr. Hagan (similar to what took place later in February) or a review of his chart by someone to determine the status of his care (which might have revealed that Dr. Hagan was awaiting an x-ray that never was taken). However, there are a number of possibilities,

---

[7] With respect to Rummer's failure to produce the "phantom" kites and grievances during discovery, the ultimate recommendation here is not dependent on them being struck because of Rummer's failure to produce them during discovery.

including that the duty nurse may have believed that a refill of the pain medications already prescribed was sufficient to address the pain complaints and that others were attending to any pending diagnostic tests - particularly given the ambiguity of the kite. Also, Rummer has not pointed to any evidence indicating that any of the three personally named defendants were aware of his January 23, 2011, request. In fact, the initials on the response do not appear to be for any of the three named defendants and, as noted earlier, these requests were generally not routed to Dr. Hagan even if they were addressed to him, and Dr. Hagan denies any knowledge of any of the many kites at issue.

In summary, for the time period from October 5, 2010, until March 8, 2011, it does appear that someone "dropped the ball" and likely was negligent. However, there is no credible evidence that the delay was deliberate much less intended to make Rummer suffer. Further, the only evidence that Rummer was suffering from pain at such levels that would warrant immediate medical care and/or the administrative of powerful narcotics, much less that the personally named defendants were aware of that fact, comes again only from Rummer's self-serving statements and declarations. In making this latter observation, the undersigned is not ignoring the objective medical evidence that suggests Rummer likely had some nerve root impingement causing discomfort at a level where a person would want to have it addressed. The question here, as noted earlier, is the degree of pain that Rummer claims he was suffering.

Finally, the lack of independent corroborating evidence for pain levels as great as Rummer claims is true for the remaining time periods being considered, so this point will not be repeated. For the remaining time periods, the focus will be on additional matters that are particularly significant.

5. **The time period between when Dr. Hagan saw Rummer on March 8, 2011, to when Rummer saw Dr. Spagnolia on August 4, 2011**

Dr. Hagan saw Rummer on March 8, 2011.  (Doc. Nos. 69-3, p. 5, 80, ¶ 132).  Dr. Hagan's

notes from the appointment state:

> S: Werner is here today with cervical spine pain.  This is right at the base of the C spine.  He says he feels tight.  He is able to get a fair amount of anterior flexion and posterior extension.  He has some difficulty with lateral rotation both turning the chin to left and to the right.  He has good strength throughout and no change in sensation.  He is taking baclofen.  He said nonsteroidal anti-inflammatories have never been useful and he doesn't use them.
>
> O: Exam is as above.  Vitals are reviewed.  Blood pressure is elevated today at 174/103.  The patient, who is markedly deconditioned and overweight, has just climbed the stairs.
>
> A/P: Continued neck pain – at this point I will get a C spine x-ray, AP, lateral and lateral extension and flexion.  I will see the patient back.  I have already ordered the x-ray and ordered the follow up appointment.  I let Werner know that this may represent the maximum medical improvement for him.  He has had previous surgeries and previous treatment.  He is aware.

(Doc. No. 80, Ex. P-131).

A follow-up appointment with Dr. Hagan was set for March 22, 2011.  (Doc. Nos. 69-2, ¶

21; 69-3, p. 5).  Dr. Hagan's notes from that date indicate that the x-ray report was this time again

not available, and Rummer's appointment was rescheduled.  (Id.; Doc. No. 80, Ex. P-133).  Rummer

was placed on the NDSP x-ray list for March 23, 2011.  (Doc. No. 80, Ex. P-132).  His x-ray was

taken on March 22 or March 23, 2011.  (Doc. Nos. 69-2, ¶ 21; 69-3, p. 5; 80, ¶ 135).

Dr. Hagan saw Rummer to review the x-ray on April 12, 2011.  Dr. Hagan's notes from the

appointment state:

> S: Werner is here today to follow up on continued left neck and shoulder pain.  He has had a previous C6 foraminotomy.  He had some relief for a while, but his pain is back.  He has had a plain neck x-ray, which really didn't show any changes.  His pain does continue.  He is otherwise without other complaint today.

O: On exam today the patient's vitals were reviewed; they are largely unremarkable. No other formal exam is performed today.

A/P: Continued neck pain with concern for radiculopathy – at this point the patient would benefit from a repeat MRI. We need this without contrast as he has no instrumentation in place. He and I are aware that this may represent his maximum medical therapy and he may have to tolerate *this discomfort*; however, I would like to be sure there is no impingements before we settle that issue.

(Doc. No. 80, Ex. P-134) (italics added). Notably, the determination of whether an MRI should be obtained, based first upon the review of a screening x-ray, took over seven months from when Dr. Hagan first ordered an x-ray for that purpose on September 7, 2010.

Rummer's C-spine MRI was performed on April 19, 2011 and was interpreted by an outside physician. (Doc. Nos. 69-2, ¶ 26; 69-3, p.6; 80, Ex. P-135). A follow-up appointment with Dr. Hagan was set for May 3, 2011 and was later rescheduled for May 24, 2011 because Rummer was unavailable on May 3. (Doc. Nos. 69-2, ¶ 27; 69-3, p. 6). Dr. Hagan's notes from the visit state:

S: Werner is here today to follow up on ongoing neck pain. He has some radicular neck pain at about the C6 distribution. He has treated this conservatively with no real improvement. He underwent an MRI while [sic] ago at this time; unfortunately, he was then on temporary leave due to duties with the court and has now returned. As we look at the readings for the patient's MRI, it does show us at level C5-6 a small central bulge and is causing a little foraminal stenosis. This is roughly the area where he has had previous intervention and surgery.

O: On exam vitals were reviewed. Blood pressure is slightly elevated. No other exam is done today.

A/P: Recurrent neck pain after foraminal surgery in the past– At this point I will have the patient seen by Dr. Spagnolia and give us direction as to further diagnostic and therapeutic modalities that are available to the patient.

(Doc. No. 80, Ex. P-136A).

Rummer's appointment with Dr. Spagnolia was originally set for July 14, 2011, and was later rescheduled for August 4, 2011. (Doc. No. 69-2, ¶ 32).

On July 29, 2011, Rummer submitted an inmate request that stated, "I've been trying to suck it up for months now but can't take the pain in my neck and shoulders any longer. I really need something for pain or I'm going to lose my mind! Seriously. Please prescribe something for pain until I see Dr. Spagnolia." (Doc. No. 80, Ex. P-138). Rummer was seen by a nurse that day and was placed on doctor call. (Doc. No. 69-3, p. 6). Dr. Hagan saw Rummer on August 2, 2011. (Doc. Nos. 69-2, ¶ 34; 80, ¶ 148). Dr. Hagan's notes from the visit are not included in the record. Dr. Hagan states that he advised Rummer that he would confirm the referral to neurosurgery was in place. (Doc. Nos. 69-2, ¶ 34; 69-3, pp. 6-7).

Rummer claims that, during the time frame from when he saw Dr. Hagan on March 8, 2011 until he saw Dr. Spagnolia on August 4, 2011, he continued to complain about intolerable pain both to Dr. Hagan on the two occasions that he saw him and by written and verbal requests for medical attention.

Dr. Hagan denies that Rummer ever complained about intolerable pain. Also, in his contemporaneous notes, he described his impression of Rummer's conditions as involving "discomfort" that Rummer may have to live with. But, despite this observation, he did not stop attempting to address Rummer's complaints of what he considered to be discomfort. Rather, he scheduled Rummer for the MRI, albeit after considerable delay. Further, even though the results of the MRI were inclusive and he might have been justified concluding that any discomfort was the result of a new soft-tissue injury that either Rummer might have to live with or that might eventually go away, Dr. Hagan nevertheless scheduled Rummer to see Dr. Spagnolia.

### 6. Dr. Spagnolia's August 4, 2011 evaluation in which he is uncertain about the principal cause of Rummer's discomfort

On August 4, 2011, Dr. Spagnolia saw Rummer on the referral for evaluation of his neck and

arm pain. A copy of the report of his examination is included in the record. (Doc. No. 80, Ex. P-140A). The report is notable in several respects.

First, in the "history" portion of his report, Dr. Spagnolia discussed Rummer complaints about the pain in his neck and shoulders as well as the stiffness. He records Rummer as stating that his pain at the time of the examination was 3 on a scale of ten but at times it could be as high as 7-8/10. Further, in the "physical exam" portion of the report, Dr. Spagnolia states that Rummer "appears to be in no apparent distress." Notably, these observations and history are more consistent with Rummer suffering chronic discomfort, with perhaps occasional sharper pain, rather than long-lasting high levels of intolerable pain. That is, Rummer's pain levels were no greater than what this court often sees in Social Security disability cases for persons who often have to live with similar levels of pain either permanently or for significant periods of time until they can be treated by a specialist, if the underlying condition is amenable to treatment.

Second, it is clear that, after review of the MRI, Dr. Spagnolia is uncertain about what exactly might be causing Rummer's neck stiffness and discomfort. He opines in the "impression" section of his report that Rummer might have a soft-tissue whiplash injury, in addition to an unconfirmed left C7 radiculopathy that might exist based on his subjective complaints, with the whiplash injury possibly being predominant. More particularly, he states:

> My impression is the patient has a cervical whiplash injury in association with his subjective left C 7 radiculopathy. I discussed options with him. I did not feel that he is more than likely going to completely recover from this. I would have expected that quite a long time ago. I told him I think he needs aggressive physiotherapy. I would recommend physiotherapy for his neck approximately once a week for 3 weeks and that he should do his own home exercises basically with flexion, extension, lateral rotation, lateral bending, and do these 15 to 30 times a day. I did demonstrate those for him so he understands. In addition, I would recommend Naprosyn 500 mg twice daily if he can tolerate it from a medical standpoint. I also told him that I thought Neurontin would be useful if the prison system had this. I

would start at 300 mg daily to see how he does for 3 days and increase it to 300 mg twice a day for 3 days and then ultimately to 300 mg 3 times a day and titrate to effect of helping his left arm. If he does not seem to get better over a month's period of time, we would plan to see him back, and I would recommend some injections; most likely a selective C7 nerve block to see how he would respond to that. given [sic] that he has about 50% neck pain and 50% arm pain, I told him a neck operation such as he had previously would more than likely not give him the relief that he expects because there is a significant predominance of cervical whiplash with his current problem. He did not have this type of problem before and had much better recovery. We will plan to make these recommendations to Dr. Hagan, and they can institute these as they see fit. I would like to see him back in 1 month.

(Id. at Ex. P-140C).

Third, Dr. Spagnolia recommended some changes in Rummer's medications to address his discomfort and also recommended physical therapy ("PT") to try to address the underlying problem. Notably, he did not recommend narcotic pain medications that are routinely prescribed for unrelenting severe pain or suggest that Rummer be immediately hospitalized. In fact, there is nothing in his report which indicates that he believed Rummer was suffering from that level of pain and the referral for PT suggests the opposite.

Fourth, all of the recommendations that Dr. Spagnolia made were implemented by the NDSP. Rummer was: (1) started on both Naprosyn and Gabapentin (Neurontin)[8] on August 5, 2011(Doc. No. 69-4, p. 1); (2) seen for PT three times (August 17, August 23, and September 1, 2011), which was discontinued because of lack of any appreciable improvement (Doc. No. 80, Exs. P-144A to P-146B); and (3) sent back to Dr. Spagnolia for a review within the time period requested, as discussed further below.

Rummer claims that, during the August 4, 2011, examination, Dr. Spagnolia: (1) opined that Rummer's neck problems likely would be permanent because of the NDSP's delay in treatment; (2)

---

[8] Gabapentin is the active ingredient in Neurontin. https://en.wikipedia.org/wiki/Gabapentin (last accessed on July 17, 2015).

that Rummer may need to be on powerful narcotics for the rest of his life to address the horrible pain he was suffering and would continue to suffer; and (3) he was willing to put his alleged views on Rummer's negligent treatment in writing for Rummer to present to the German government to support his attempts to get deported to his "home country."  (Doc. No. 80, ¶¶ 150-152).  As explained later, Dr. Spagnolia died tragically in 2013 and is unable to respond to the statements attributed to him by Rummer. What is reflected in his report, however, belies these purported hearsay statements, even if they were admissible.

### 7.     The records for PT sessions on August 17, August 23, and September 1, 2011

Rummer claims that, during the time period he was referred for PT, he continued to suffer from intolerable pain which was exacerbated by the PT.  He complains in his affidavit about being put into a traction device on each of the three visits and describes this as a "nightmarish adventure through the gates of hell was synonyms to torture, being placed into that traction device, with a spinal cord injury without adequate pain medication!"  (Doc. No. 80, ¶¶ 158-160).  He does not explain, however, why he subjected himself to this treatment three times.

Also, there are several other things of note about the PT records.  First, the PT was performed by an outside medical provider - Sanford.  Second, on each of the three visits, Rummer reported that his pain level was 5 out of 10, although he did state it would sometimes range as high as 8.  Third, the PT reports make no mention of any increased pain or suffering resulting from the PT.  (Doc. No. 80, Ex. P-144 to P-146).

### 8.     Time period from August 2011 to March 20, 2012 when Dr. Spagnolia recommends surgery on his Rummer's neck

On September 6, 2011, Dr. Hagan saw Rummer for an annual physical.  Dr. Hagan's notes

from the visit state:

> S: Werner is here today for his annual physical.  He has just recently undergone a prostate exam and rectal exam; these were normal.  He is being treated currently for a number of conditions, including chronic rhinitis for which he uses Flonase which works well, low back pain which is treated with baclofen and amitriptyline, GE reflux for which he had Prilosec in the past, BPH symptoms which are doing well on high dose tamsulosin per the patient, and neck whiplash which is being treated with Naprosyn and gabapentin.  The patient feels that this medication is not working and he is looking forward to seeing the neurosurgeon back for further evaluation and treatment.  Other issues for him today include ongoing neck pain and arm pain.  The patient says that he finds his pain extreme and that he doesn't feel the Naprosyn and gabapentin have been helpful. . . .
>
> . . . .
>
> A/P:
> 1. Chronic rhinitis – I will continue Flonase.
> 2. Low back pain – Continue baclofen and amitriptyline.
> 3. GE reflux – I will add Prilosec.
> 4. BPH – Continue tamsulosin.
> 5. Whiplash – The patient is continuing physical therapy and medications, and his care is being directed by Neurosurgery.
> . . . .

(Id. at Ex. P-147).

On September 16, 2011, Dr. Spagnolia saw Rummer for a follow-up appointment.  There are several items of note with respect to this visit.  The first is that the pain level reported by Rummer on that occasion was "5/10."  Second, Dr. Spagnolia's "impression" stated:

> My impression is the patient has mechanical whiplash injury resulting from the fall in addition to what appears to be a C7 radiculopathy.  It appears to be, however, very subjective.  The only objective evidence is a slight decrease in the reflex on the left side.  His motor strength seems to be symmetric.  I discussed options with him.  I think he would benefit from a selective nerve block on the left at C7.  I think he should discontinue the Neurontin and continue the Naprosyn.  I did not really have any other options for him at this point for the neck pain since I think that is musculoskeletal.  As far as his cervical radiculopathy, we will plan to see how he does with a pain log and the C7 block.  He has been through this before and knows that he will need to keep a pain log both before and after the injection.  If he gets significant improvement, he may be a candidate for a posterior foraminotomy on the

left at C7.  We will await approval from Dr. Hagen [sic] to have that block.

(Id. at Ex. P-148A to P-148B).  The significance of this is that Dr. Spagnolia remained uncertain as to whether there was any nerve root impingement at the C7 level and still believed that a significant part of Rummer's discomfort was soft-tissue in origin.  Further, the only thing that Dr. Spagnolia stated with respect to possible surgery was that he "may" be a candidate for a posterior foraminotomy on the left C7 but that would depend upon the results of the nerve block test.  No place in his report did he say that it was necessary to see Rummer back at any particular point in time.

As with the August examination, Rummer claims that Dr. Spagnolia made a number of statements to him verbally during the September examination about the fact that any surgery would only have a 5% chance of succeeding because of the NDSP's purported 18-month delay in treating his "spine injury" and that Dr. Spagnolia agreed to talk to Dr. Hagan about prescribing narcotic pain medication for him.  (Doc. No. 80, ¶162).  Again, these purported statements find no support in Dr. Spagnolia's report, including particularly that Rummer suffered from a "spine injury."  At most, the report suggests the possibility, based on Rummer's subjective complaints, of a pinched nerve.  Also, Dr. Hagan denies that Dr. Spagnolia ever talked to him following this examination about prescribing narcotics.  (Doc. No. 87-1, p. 9).

Dr. Michael Quast performed the nerve block procedure on October 20, 2011.  (Id. at Ex. P-149A).  Rummer reported a decrease in pain from 8/10 before the procedure to 0/10 fifteen minutes after the procedure.  (Id.).  Notably, Dr. Quast's report notes that it was routed to Dr. Spagnolia.  Of some significance to what Rummer complains about later, there is no indication that Dr. Spagnolia, for whom the nerve block was conducted, ever contacted the NDSP about seeing

Rummer again, much less immediately. And, from the perspective of Dr. Hagan, it is clear from his reports that he was deferring this part of Rummer's treatment to Dr. Spagnolia.

Rummer claims that he submitted numerous kites following the nerve block performed by Dr. Quast complaining about his continued pain and the need to be returned to see Dr. Spagnolia. The NDSP denies that most of these kites were ever presented. However, defendants acknowledge the receipt of two. The first is dated December 27, 2011. In that kite, Rummer stated:

> The pain in my neck, arm and shoulder has now moved to my other side! I'm suffering insane pain and my patience has run out. This is almost 2012 and no reason why I should be forced to suffer like this without having thoughts of suicide cuz I'm hurting so bad!! Please help me. I need something for this god aweful [sic] pain!!! Both my arms, both shoulders and both sides in my chest are now hurting!!

(Id. at Ex. P-150). The response suggest that Rummer was scheduled for doctor call. (Id.). The next is dated December 29, 2011 and reads:

> Would you please arrange something for my horrible neck pain & shoulder pain until I return to Dr. Spagnolia. I can't even sleep at night its so bad - but then you already know that. Thank-you.

(Id. at Ex. P-156). The response to this is somewhat cryptic and appears to state: "ref. to Tanya - mtn appt. c Spagnolia was planned." (Id.).

It is unclear what, if any, action was actually taken with respect to these kites. Also, for reasons stated earlier, there is no evidence that any of the personally named defendants were aware of them. Nevertheless, as discussed in a moment, Rummer was sent to Dr. Quast for a cervical epidural steroid injection to address his pain complaints in early February 2012, but it is unclear who decided this should be done or when this decision was made.

On January 3, 2012, Rummer sent defendant Bachmeier a letter requesting that the NDSP provide him a bed topper to help alleviate his neck and arm pain. (Id. at Ex. P-157). Bachmeier

denied the request, responding, "For back injuries a firm mattress surface is best.  The medical department doesn't provide comfort toppers."  (Id.).

Rummer alleges he submitted an inmate request for pain treatment on January 16, 2012.  (Id. at Ex. P-158).  Defendants contend that this request was not presented to NDSP officials.  (Doc. No. 87, pp. 3-4).

On January 30, 2012, Rummer submitted an inmate request that stated:

> The horrible pain in my neck and shoulder has moved to my other side as well as into my chest from my spine injury suffered almost 2 years ago.  I've been waiting 4 months almost to be taken back to see Dr. Spagnolia after the Oct. 20th nerve block.  Since the nerve block my pain has virtually doubled and I need something for the intense pain I'm suffering.  At least until you guys get me back to see Dr. Spagnolia to schedule my spine surgery.  My Naproxin prescription has run out again as well a few days ago and needs to be refilled.

(Doc. No. 80, Ex. P-160).  A "Response to Refill Request" dated January 30, 2012, states that Rummer did not have any refills for his Naproxen prescription and that the pharmacy had contacted Rummer's physician to see if he wished to refill the prescription.  (Id. at P-162).  Dr. Hagan issued Rummer a Naproxen refill on February 7, 2012.  (Doc. No. 69-3, p. 9).

On February 6, 2012, Rummer saw Dr. Quast for the cervical epidural steroid injection.  (Doc. No. 80, Ex. P-164A to P-164B).  As noted earlier, there is nothing in the record that indicates who ordered this injection, i.e., whether it was ordered by Dr. Hagan, Dr. Spagnolia, or was follow-up care by Dr. Quast.  In any event, the injection was for the purpose of addressing Rummer's complaints about continued pain.

On February, 9, 2012, Dr. Hagan saw Rummer. (Doc. No. 69-3, p. 9).  Dr. Hagan noted that Rummer had recently seen Dr. Quast and advised Rummer that he would ensure that a plan was in place for him to be seen by Dr. Spagnolia.  (Doc. Nos. 69-2, ¶ 45; 69-3, p. 9).  As noted earlier, the

actual coordination of inmates seeing outside specialists was performed by persons other than Dr. Hagan.

In terms of the delay in Rummer being returned to see Dr. Spagnolia following the October 2012 screening nerve block performed by Dr. Quast, there is no evidence it was deliberate. If anything, the delay appears to have been due to a lack of communication and coordination either within the NDSP's medical department or, just as likely, between Dr. Spagnolia and the medical department. For example, when Dr. Spagnolia requested the screening nerve block, he did not indicate in his report when he should see Rummer next, as noted earlier. The NDSP's medical department may very well have been waiting to hear from Dr. Spagnolia as to whether he wanted to see Rummer again after reviewing the results of the nerve block since a copy of the results of the nerve block was sent to him as well as to the medical department.

### 9. Time period from when Dr. Spagnolia recommend's surgery on March 20, 2012 until when the surgery performed on September 12, 2012

On March 20, 2012, Dr. Spagnolia saw Rummer for a follow-up appointment. His report is part of the record. (Doc. No. 80, Exs. P-165A to P-165B). In the "history" portion of the report, Dr. Spagnolia notes that Rummer was complaining bitterly about left shoulder blade pain with radiation to his arms, as well as chest pains, and that his reported pain level on that day was 7 out of 10. Dr. Spagnolia also noted that the epidural steroid injection performed by Dr. Quast (the procedure performed in February 2012) provided "significant improvement" at least for a period of time.

Dr. Spagnolia also states that in the "history" portion of the report that "patient unfortunately took approximately 5 months to see us again." Rummer jumps on this as further evidence of what he views as inexcusable delays in providing him care and further evidence that the delays in

treatment resulted in the surgery that was later performed for the decompression of his nerve at the C7 level not being successful because of the passage of time. This latter point will be returned to later. However, while Dr. Spagnolia may have made this comment, there was nothing in his immediately preceding report that suggested a timetable for Rummer's return as already discussed and part of the responsibility for any delay may fall at his doorstep.

In the "impression" section of Dr. Spagnolia's report of his March 20, 2012 examination, he states:

> My impression is that the patient has a left sensory C-7 radiculopathy related to the foraminal narrowing on the left at C6-7 . . .
>
>> My recommendations would be to have a repeat MRI done and then plan a left C-7 posterior cervical foraminotomy. I did go over that operation with him in detail including the risks, complications, and usual postop recovery period. I answered all of his questions. He was concerned about having some pain medications. I told him that I would recommend some hydrocodone 5/500 one tablet every 8 hours p.r.n. for pain but that it would be up to the prison system to decide whether or not he could have that.
>
> . . . .
>
> I did talk with Dr. Hagan who is agreeable with the above options and we will plan to have those done. Surgical timing will be up to Dr. Hagan and the prison system although I did emphasize to both patient and Dr. Hagan that having a long-term compression of the nerve certainly does not bode well for a good recovery. We would want to try to do this in a timely fashion.

(Doc. No. 80, Exs. P-165A to P-165B).

On April 1, 2012, Rummer sent a letter to Bachmeier in which he stated that he had not received the pain medication prescribed by Dr. Spagnolia and requested to be placed in the NDSP infirmary and given hydrocodone. (Doc. No. 80, Ex. P-166). Wilkens provided a written response on Bachmeier's behalf, which explained why hydrocodone had not been provided as follows:

The medication Dr. Spagnolia ordered is a narcotic and narcotics are addicting. Outside medical providers do no dictate the medical care provided to inmates. The DOCR physicians review all suggestions from outside providers but the final decision lies with the DOCR primary care provider. It is in an inmate's best interest to not receive an addictive medication when there are other non-addictive medications available. Dr. Hagan reviewed the order received from Dr. Spagnolia and did not recommend an addictive narcotic for long term pain management. I have sent a referral to Dr. Hagan to review your request for medication to treat your pain, in addition to your current dose of Naproxen.

(Id. at Ex. P-169).

On April 10, 2012, Dr. Hagan saw Rummer to discuss Rummer's pain. Dr. Hagan's notes

from the visit state:

S: Werner is here today to follow up on neck pain. He has had a recent evaluation with Dr. Spagnolia, who is recommending surgery for him. Werner asks about options for pain. One suggestion from Neurosurgery is to consider narcotics. Werner and I discussed this today.

In discussion today I have let Werner know that narcotics are not long-term solutions in a prison facility and we will use other techniques to manage his pain. He said he is aware that narcotics are not available long term here.

In looking at other options, Werner said that his naproxen has not been very effective for him. **He also notes that baclofen helps, but doesn't help him throughout the day**. He wonders if there are changes in the meds that can be made.

O: On exam today:
Blood pressure looks minimally elevated at 140's/90's. He is otherwise well. He is obese appearing. No other physical exam is performed today in the AS clinic.

A/P: Ongoing neck pain – At this point I would like to change the patient's nonsteroidals from a propionic acid class[9] to etodolac and see if this is more helpful. This will be at 400 mg twice a day. He is aware of GI risks, cerebrovascular risks, and cardiovascular risks. Additionally, I will increase his baclofen to 40 mg twice a day and 20 at noon. He is aware that this is above the normal maximum dose, but he said he would rather be sleepy that have this discomfort. In discussing this with Mr. Kunkel [Rummer], he agrees that the best solution is adjustment of medications and to proceed to surgery.

---

[9] This is apparently a reference to naproxen, which is a nonsteriodal anti-inflammatory drug of the propionic acid class. See https://en.wikipedia.org/wiki/Naproxen, (last accessed on July 28, 2015).

(Id. at P-170) (emphasis added)

On April 12, 2012, the MRI requested by Spagnolia was conducted. (Doc. Nos. 69-2, ¶ 50; 80, Ex. P-171). On April 16, 2012, Dr. Jeff Hostetter reviewed Rummer's chart and approved Rummer for surgery with Dr. Spagnolia. (Doc. Nos. 69-2, ¶ 51; 69-3, p. 12).

On August 3, 2012, Rummer submitted an inmate request in which he stated:

> It's been almost 5 months now since the operation to my spine was ordered. Is there something wrong? Why is it taking so long? My noon meds that you prescribed negating the meds Dr. Spagnolia ordered for me on March 20th, is due to expire next week on August 8th. The prescription is going to need to be extended obviously, not that it's doing a hell of a lot of good for the pain – just makes me tired as heck. Anyway, would you please let me know what's going on with the surgery and why it's taking so long? The pain is killing me!!

(Doc. No. 80, Ex. P-173). In response, Rummer was advised that the surgery had been scheduled but that it would be a while before it was completed. (Doc. Nos. 69-2, ¶ 52; 69-3, p. 12).

Rummer alleges that he submitted inmate requests for pain treatment on August 19 and 22, 2012. (Doc. No. 80, Exs. P-173 to P-174). Defendants contend the requests were not presented to NDSP staff. (Doc. No. 87, pp. 3-4).

Rummer points to the passage of six months between when Dr. Spagnolia recommended surgery to when it took place as being another instance of inexcusable delay and that again this contributed to a poor result. Whether any delay was consequential will be addressed later. However, in terms of the six-month period of time that Rummer complains about, approximately a month of that was consumed by the taking of the MRI that Dr. Spagnolia wanted first and his subsequent review of the MRI. And, when he made his review on April 12, 2012, it was only four

days later that Dr. Hostetter[10] reviewed Rummer's chart for the medical department and approved him for surgery. As for why it took five months after that for Rummer to have his surgery, Dr. Hagan explains in his affidavit that, since it was not emergency surgery, it took time to get it scheduled because of Dr. Spagnolia's considerable backlog. (Doc. No. 69-2, ¶ 52). In any event, there is no evidence the delay was deliberate.

Rummer also complains about the fact that Dr. Spagnolia included in his March 20, 2012 report a recommendation that Rummer be placed on hydrocodone if the NDSP would permit it. While this point will be returned to later, Dr. Hagan did meet with Rummer and explain why habit-forming narcotics were not a good option in a prison setting and that the better option would be to make some further changes in his existing medications and try the surgery recommended by Dr. Spagnolia as well. One of the changes that Dr. Hagan made was to add an additional dosage of baclofen to be taken at noon in addition to the morning and evening dosages. This was because Rummer reported that the baclofen helped, but would not get him through the entire day. (Doc. No. 80, P-170). In addition, Dr. Hagan also to started him on 400 MG Etodolac, to be taken twice daily. (Doc. No. 80, P-170).

What is particularly significant about this is that Dr. Hagan considered Rummer's particular situation in coming up with non-narcotic alternatives. Also, Rummer claims that the non-narcotic medications never did any good. But, according to Dr. Hagan's contemporaneous notes, Rummer reported that the baclofen, which Rummer was on during the entire period in question here, did help.

---

[10] While the record does not indicate why Dr. Hostetter was called upon to make a decision with respect to approval or disapproval of the surgery, it may have been because defendant Kathy Bachmeier was already in the process of separating from her duties, since she retired from the DOCR effective May 31, 2012.

**10.    The time period beginning with Rummer's September 12, 2012 surgery through his followup appointment with Dr. Spagnolia on November 2, 2012**

Dr. Spagnolia completed Rummer's surgery on September 12, 2012. (Doc. No. 80, Exs. P-176A to P-176B). Rummer was discharged on September 13, 2012, with a recommendation for hydrocodone for pain relief as needed. (Id. at Ex. P-176C). As noted earlier, this was administered for a period of time in the prison infirmary upon discharge.

On September 17, 2012, Dr. Hagan saw Rummer in the infirmary. His report indicated that Rummer was doing fairly well and was not in need of narcotics at that point. (Id. at Ex. P-180).

On September 28, 2012, Dr. Spagnolia saw Rummer for a follow-up visit and the staples in Rummer's incision were removed. Dr. Spagnolia's "impression" from that visit states:

> My impression is he is improving. I told him it would take almost two months for him to recover from the surgery since this is quite a painful operation to go through the cervical musculature. We will plan to see him back in about a 2-month period to see how he is doing. Overall I think the surgery did improve his chest pain and hopefully as the incision heals his neck pain will subside.

(Id. at P-181).

Rummer claims that there simply was no excuse for the expiration of the almost two years from when Dr. Hagan saw him in September 2010 and requested an x-ray to evaluate his complaints of neck pain to when he actually had surgery in September 2012. Rummer claims that this delay resulted in the surgery being unsuccessful. Again, this point will be addressed later.

In late September or early October 2012, some of Rummer's prescriptions expired. (Doc. No. 69-3, p.13). On October 10, 2012, a member of the nursing staff wrote Rummer a note apologizing that he had been without his medications and indicating that referrals to renew the prescriptions had been sent to Dr. Hagan. (Doc. No. 80, Ex. P-182). On October 12, 2012, Rummer

submitted an inmate request complaining about the expired prescriptions.  (Id. at Ex. P-183).

Rummer's prescriptions were apparently refilled shortly after the referral.

On November 2, 2012, Dr. Spagnolia saw Rummer for a follow-up visit.  In his report of the

examination, Dr. Spagnolia noted that the surgical wound was healing nicely but that Rummer

reported he was still experiencing some post-surgical pain.  In terms of his shoulder and neck pain,

Rummer reported that it was at about 4.  (Id. at P-184).

In the  "impression and plan" portion of his report, Dr. Spagnolia's notes:

> My impression is that he has residual C7 radiculopathy and I told Mr. Kunkel
> [Rummer] that most likely this might be there for some time because of the period
> of time he has had the problem before having any decompression.  In addition, I told
> him that I would think that Neurontin would be a good option for him even though
> it did not seem to help last time.  Given that his nerve is decompressed, it may be
> useful this time.  I recommended starting out at dose of 300 mg daily for 3 days, then
> escalating the dose to 300 mg twice a day for 3 days, 300 mg 3 times a day for 3
> days, and then going up to 400 mg 3 times a day for a total of 1200 mg daily.  I
> would stop at this dosage.  If he has any trouble with his side effects from the
> medication, we would discontinue the medication. . . .  He does tell me that he will
> be transferred to a federal facility upon our discharge from the clinic.  I told him that
> I would like to see him back in another month to see how he is doing and hopefully
> that can be delayed until we make some progress on his current problem.

(Id.).

### 11.    The time period from Dr. Spagnolia's followup on November 2, 2012, until he sees Rummer again on May 10, 2013

The NDSP did put Rummer back on Neurontin as Dr. Spagnolia recommended on November

2, 2012, which was in addition to other medications that were being given for pain relief.  However,

there was some slight delay.  A chart review note by Dr. Hagan dated November 6, 2012, states that

Rummer's Neurontin prescription was not started at the expected time and that the order for

Neurontin was rewritten to readdress the ramping up of the daily dosages.  (Id. at P-185).  The

NDSP's records of the prescriptions given to Rummer show that Rummer received one 300 mg dose

of Neurontin on November 5, 7, 8, and 9, 2012; two 300 mg doses on November 10 and 11, 2012; one 300 mg dose on November 12, 2012; three 300 mg doses on November 13, 14, and 15, 2012; and three 400 mg doses per day beginning on November 16, 2012. (Doc. No. 69-9, pp. 17-21).

Rummer alleges that between December 17, 2012 and February 18, 2013, he submitted seven inmate requests asking to be seen by Dr. Spagnolia and complaining of continuing pain. (Doc. No. 80, Exs. P-186 to P-192). Defendants contend the requests were not presented to NDSP staff. (Doc. No. 87, pp. 3-4). On February 28, 2013, Rummer submitted an inmate request that stated:

> I've been on post-operation medication for my spine operation since I last saw Dr. Spagnolia last year. I've gritted my teeth putting up with the terrible pain for several months now. A drug call Nuerotin (sp)? And Naproxen?? The meds are doing nothing for my pain – <u>zero</u>. I need to be on something that will take this pain away. I've given more than a fair amount of time to get better – pain free, and it's just not happening. Lock me up in the infirmary, I don't care, I need some pain relief.

(Doc. No. 80, ex. P-193). Rummer was referred for doctor call. (<u>Id.</u> at P-194).

On March 7, 2013, Rummer submitted another inmate request regarding his pain. (<u>Id.</u> at P-195). He was referred to doctor call. (<u>Id.</u>). Rummer alleges he submitted an additional inmate request regarding his pain on March 11, 2013. (<u>Id.</u> at P-196). Defendants contend the request was not presented to NDSP officials. (Doc. No. 87, pp. 3-4).

On March 13, 2013, Dr. Hagan saw Rummer. Dr. Hagan's notes from the visit state:

> S: Werner is here today to follow up on left upper extremity radicular pain. He underwent surgery with fusion and says his pain is no better at all. He does continue to take his Neurontin 400 mg po tid, Tylenol, naproxen, baclofen, and high dose amitriptyline as well. He wonders what else can be done. He has recently been let out of AS. He is having a little more difficulty taking his medications, particularly three times a day.
>
> O: Blood pressure today is elevated as he comes in; it is 176/94. He walks without an antalgic gait. He has a Tupperware container for fluids, it looks like it has coffee or iced tea in it. He is able to place his right hand on the examining table. He bends at the waist rather than knees and uses his left arm to place this on the floor. This

puts him at about a 95° or 100° position in anterior elevation.

No other formal exam is done today. As the patient leaves he is able to bend and pick that fluid container up again with his left arm.

A/P: Chronic pain failing surgery and multiple medications – At this point I will have the patient seen back by Neurosurgery to see if there is anything further that can be done. I suspect he may benefit from injection therapy at this time. I will leave this in the hands of the experts. I will increase the patient's Neurontin to 800 mg twice a day. He said he would prefer that to coming three times a day in line. He does want an increase in the dose.

(Doc. No. 80, Ex. P-197).

On April 11 and May 2, 2013, Rummer submitted inmate requests indicating that the medications he was receiving were not relieving his pain and requesting to be seen by a doctor. (Doc. No. 80, Exs. P-198 to P-199). The NDSP denies they were sent, again based on the lack of any record of them.

On May 10, 2013, Dr. Spagnolia saw Rummer for a follow-up appointment. In the history portion of his report, Dr. Spagnolia recounts Rummer's prior history of treatment and notes that in April 2013 Rummer had a painful bout of shingles in the genital area and that he was hospitalized and treated with hydrocodone. He states that Rummer reported that hydrocodone helped alleviate the pain in his neck, shoulder, and chest areas and states "[u]nfortunately, he is not being on that medicine anymore having healed from his singles [sic]." Dr. Spagnolia further states that Rummer's pain on that day was about a 6 out of 10.

In the "impression" section of his May 10, 2013 report, Dr. Spagnolia states:

My impression is that the patient has a left C4 sensory radiculopathy. This certainly could be a cause for his anterior chest pain and I think that I would recommend a left C4 selective nerve block with steroids. If he has significant temporary improvement with that he may benefit from a left C4 foraminotomy. I told him also that there is a potential that the shoulder blade pain might be related to residual C7 nerve problem that he had after surgery and that because of his fall he may not actually improve

from that. However, we would plan to reevaluate him with a possible C7 nerve block should he not get any improvement from the C4 block. This is all of course dependent on Dr. Hagan being agreeable to proceeding with a block.

(Id. at Ex. P-200A to P-200B).

What is notable about his report is the fact that Dr. Spagnolia is uncertain about what may still be causing Rummer's pain. He suspects it might be a nerve impingement at the C4 level for at least part of it. He also suggests the possibility of another nerve block at the C7 level "should he not get any improvement from the C4 block." (Id.). He further observes that Rummer's fall may have compromised his nerve tissues at the C7 level and that there may be no improvement. What he does not say is that any delay in treatment was the cause of any failure to get relief up to this point or in the future.

### 12. Treatment following Dr. Spagnolia's May 5, 2013 examination through the conclusion of the present record

On May 27, 2013, Rummer submitted an inmate request that stated in relevant part, "My neck, shoulder and back pain from the spine issue hurts so bad it's taking my breath away. Literally speaking, my God, can't you give me something for this horrible nightmare of a pain that's sapping the life out of me??? Dammit – can't you help me!?!?" (Id. at P-201; Doc. No. 87-6). The response to the request stated that Rummer was on doctor call. (Doc. No. 87-6).

Dr. Hagan saw Rummer on May 30, 2013. His notes from the visit state:

S: Werner is seen today for ongoing neck and arm pain. He has already seen Neurosurgery and is undergoing selective nerve block with a follow up appointment. In the meantime he is taking about 2400 mg of gabapentin without much benefit. He is already on high doses of baclofen and other medications. He wonders what other options might exist. . . .

O: On exam today vitals were reviewed. Blood pressure looks excellent. He is well appearing. He is moving without difficulty. His walk is normal in stride, gait, and station.

. . . .

A/P:
1.    Continued neck and arm pain – As the patient proceeds through Neurosurgery evaluation, since he has had no effective benefit in gabapentin up to 2400 mg in divided doses, I will ask to see if he can eat Lyrica. I told him this might take a bit and we will let him know if that change is able to be made.

. . . .

(Id. at P-202). Rummer claims he submitted inmate requests regarding the Lyrica prescription on June 13, June 17, June 27, and July 7, 2013, asking in the last several that he be placed on doctor call to address the issue. (Id. at P-203, P-205 to P-207). Responses were made stating that Dr. Hagan was notified or the matter had been referred to him. (Doc. Nos. 87-6, 87-7, 87-8, 87-9).

Dr. Hagan, in his affidavit indicated that he did in fact submit a request for Lyrica for Rummer, but that it was not reflected in Rummer's patient records because it was not an approved formulary and had to be submitted separately to the medial director for approval. Notably, Dr. Hagan's affidavit is silent with respect to whether the medical director ever approved the Lyrica and none of the records submitted by the NDSP showing what drugs had been prescribed and administered to Rummer indicate whether Rummer was ever given Lyrica up through the beginning of 2014. (Doc. Nos. 69-4, 69-5). During this same time frame, however, Dr. Quast, a pain specialist, was seeing Rummer as noted below.

Dr. Spagnolia died sometime between May 30, 2013 and July 15, 2013. On July 15, 2013, Dr. Quast performed a cervical epidural steroid injection on Rummer. (Id. at P-209B to P-209C). The "plan" in Dr. Quast's notes states:

Dr. Spagnolia utilized cervical selective nerve root blocks as a means of diagnosing level 4 upcoming surgery. Because he is no longer available and Werner will be seeing another surgeon and at this point Werner continues to have pain, we performed an injection that was more of a treatment for the pain rather than a

diagnostic maneuver as the epidural injections has significantly less complication rates and there is usually an excellent response to the injections. We will start there and see what Dr. Alan Van Norman recommends for him. I recommend that Dr. John Hagan have Werner reestablish neurosurgical consultation with Dr. Van Norman for continued neurosurgical followup.

(Id. at P-209A).

On August 9, 2013, Dr. Van Norman, an outside neurologist who replaced Dr. Spagnolia in terms of Rummer's care, saw Rummer for further evaluation of his chronic pain. (Doc. No. 69-2, ¶ 55). He ordered an MRI of Rummer's cervical spine. The MRI was taken on September 3, 2013, and a left shoulder x-ray was taken the next day. (Doc. No. 69-3, p. 17).

Rummer continued to undergo evaluation and treatment by Dr. Van Norman through the time of the filing of defendants' motion for summary judgment. (Id. at pp. 17-19). The details of that care along with any diagnosis made by Dr. Van Norman have not been included in the record by either party. However, Rummer did indicate that as of the date of his affidavit, which was August 12, 2014, that he was scheduled for another surgery on his cervical area. (Doc. No. 80, ¶ 237).

### 13. Quantum of medical care provided by the NDSP

From 2008 through the end of the time period under consideration, the NDSP expended significant resources in attempting to get to the root of Rummer's chronic cervical pain. He was seen within the NDSP numerous times by Dr. Hagan and a countless number of times by nursing staff. He was referred to outside specialists including two different pain specialists and two neurosurgeons for further evaluations and surgical procedures. Numerous diagnostic tests were run including a number of x-rays, MRIs, and several screening nerve-blocks. Ultimately, three surgeries were performed--two by Dr. Spagnolia and one by Dr. Van Norman (assuming that his

one went forward as scheduled).

In addition, during the period from June 2009 through February 2014, the NDSP pharmacy records indicate that Rummer was prescribed over twenty-five thousand tablets of various non-narcotic medications for pain control (exclusive of Tylenol which also was given) as well as some hydrocodone following his medical procedures. (Doc. No. 69-5).

Also, during this same time frame, the NDSP provided Rummer with a substantial amount of non-routine medical care for other things - much of it at the direction of Dr. Hagan - including a carpal tunnel surgery, the surgery on Rummer's knee, hospitalization for shingles, and several non-routine dental procedures. (Doc. No. 69-3).

At least on a gross basis, this hardly smacks of deliberate indifference.

**D.      Conclusions re the deliberate indifference claims**

**1.      Delays in treatment**

There is no question that Rummer was suffering pain and discomfort in his neck and shoulder areas sufficient to warrant medical attention. In this instance, the NDSP medical department addressed Rummer's chronic pain by providing non-narcotic pain medications (except for short periods of time following surgical procedures during which he as given hydrocodone), as well as some injections, to provide some relief from the chronic pain, albeit not completely, and then attempting to get to the root cause of Rummer's pain and discomfort by surgical intervention with the recognition, however, that it might not be successful and that Rummer might have to live with his chronic pain.

Clearly, the NDSP's efforts were not perfect. As already noted, there appears to have been some institutional bungling that contributed to the long period of time between when it was

suspected that Rummer might have some additional nerve root impingement following his first surgery to when Dr. Spagnolia performed the second surgery. Rummer claims that this delay resulted in his second surgery not obtaining the desired result because the nerve root was too long compressed. In support of this argument, Rummer points to Dr. Spagnolia's March 23, 2012 evaluation report where he recommends the second surgery to relieve what might be a pinched nerve at the C-7 level and states:

> Surgical timing will be up to Dr. Hagen and the prison system although I did emphasize to both patient and Dr. Hagan that having a long-term compression of the nerve certainly does not bode well for a good recovery. We would want to get this done in a timely fashion.

(Doc. No. 80, P-165B). In making this statement, Dr. Spagnolia did not state what he considered to be "long-term" or how quickly he considered to be a "timely fashion." But, even if the time from when Dr. Spagnolia made this statement to when the surgery took place was beyond what he might have considered as optimum (and putting aside Dr. Hagan's explanation that the delay after this statement was made was largely attributable to Dr. Spagnolia's schedule because of his backlog), Rummer's claim that the outcome would have been different without the delays, both before and after Dr. Spagnolia's March 23, 2012 evaluation, is nothing more than speculation.

For one thing, it is not at all clear what the root cause of Rummer's pain was during this time period. But, even assuming it was a pinched nerve at the C-7 level, it is not known when it may have became compressed. And, if it was as late as the time of the slip-and-fall as Rummer claims, some six months elapsed before he reported pain that resulted in his being seen. Further, it was not clear initially whether this pain was caused by a possible nerve impingement at that level or whether it was a soft tissue injury resulting from the alleged slip-and-fall. This took more time to consider and evaluate, including the administration of injections for screening purposes. Finally, even Dr.

Spagnolia did not claim this was an emergency situation during the time period he was seeing Rummer and the mere scheduling of the different evaluations and procedures took time. Consequently, when all of these time periods are considered and without further professional opinion on the subject, it cannot be concluded that the outcome likely would have been different had any unwarranted delays on the part of the NDSP not occurred. In fact, as already noted, Dr. Spagnolia in his May 10, 2013 report remained uncertain as to why Rummer was still experiencing pain.

In any event, regardless of the delays and what may have been the consequences, there is not sufficient evidence to make out a jury question with respect to the subjective element of deliberate indifference with respect to any of the unwarranted delays as detailed earlier. That is, while Rummer may have presented evidence of negligence, there is not sufficient evidence for reasonable jurors to conclude that any of the three personally-named defendants' acts or failures to act amounted to criminal recklessness. See Logan v. Clarke, 119 F.3d 647, 650 (8th Cir. 1997) (delay in referral to a specialist did not rise to the level of deliberate indifference); Toney v. Hakala, No. 4:10-cv-2056, 2013 WL 5406448, *19 (E.D. Mo. Sept. 25, 2013) aff'd 556 Fed. App'x 570 (8th Cir. 2014) (unpublished per curiam affirming for the reasons stated by the district court) (presenting similar issues and noting that, while a claim for deliberate indifference is not necessarily precluded by a showing of a substantial amount of medical care being provided, it is, nevertheless, relevant, in evaluating whether the requisite subjective intent has been demonstrated).

## 2. Pain control

This leaves the questions of whether Rummer was suffering such a high level of pain that he should have been prescribed powerful, narcotic pain medications pending other treatment (or

possibly as an alternative to surgery altogether), and whether one or more of the three personally-named defendants were aware (or were criminally reckless in not being aware) that he was suffering pain to such a degree, if he was, and acted in deliberate indifference to it.

As detailed earlier, there is virtually no independent objective evidence to corroborate Rummer's complaints of intolerable and unrelenting pain, such as, visual observations by treating physicians during examinations, loss of strength in the upper extremities, etc. Further, there is substantial evidence to the contrary, including: (1) Dr. Hagan's personal observations as reflected in his notes of his many examinations as well as his affidavit testimony; (2) the records of the outside medical care providers (including neurologists, a pain specialist, and physical therapists) as detailed earlier who either made affirmative observations and history comments of reported pain levels inconsistent with the high level of pain and discomfort on a consistent basis claimed by Rummer or who failed to report it under circumstances when they clearly would have if they had they observed it; and (3) the lack of recorded observations by front-line NDSP nursing staff consistent with that level of pain and discomfort.

The only independent objective evidence is (1) the medical evidence of there being cervical issues that could be expected to cause some pain and discomfort, and (2) the suggestion by Dr. Spagnolia in the latter stages of his care for Rummer that the NDSP might consider hydrocodone for pain management. With respect to the first, there is no evidence in the record that cervical nerve impingement necessarily requires treatment with powerful narcotic pain medications. In fact, aside from what common experience teaches, the opinions expressed by Dr. Hagan in his affidavit and implicitly by Dr. Spagnolia in his not recommending hydrocodone initially are to the contrary.

As for Dr. Spagnolia's suggestion that hydrocodone might be considered, it was no more

than that. As noted earlier, he did not prescribe it earlier and, even when he recommended it, he recognized there may be a problem with it being prescribed long-term in a prison setting and did not go so far as to state that, in his professional judgment, it was absolutely necessary. Finally, the NDSP medical department, including Dr. Hagan, did not ignore Dr. Spagnolia's recommendation. Rather, it was considered and the decision was made to continue with non-narcotic formularies with adjustments being made in what was being prescribed in an attempt to provide more effective relief and the dosage of baclofen, which Rummer was already on, being increased. Further, unlike in some cases where courts have been concerned about rote rejection of the use of narcotics for pain management in a jail or prison setting without an examination, see, e.g., Strahan v. Rottnek, No. 4:13-cv-448, 2015 WL 249448, *5 (E.D. Mo. Jan. 20, 2015), the decision in this case was made based upon periodic physical examinations by Dr. Hagan and his determination of what was required for Rummer's particular situation.

At most, Dr. Hagan's rejection of Dr. Spagnolia's recommendation that the NDSP consider prescribing hydrocodone was a disagreement over the appropriate course of treatment for chronic pain and not enough to establish deliberate indifference. See Steele v. Weber, No. Civ-06-4001, 2006 WL 3544719, **5-7 (D.S.D. Dec. 8, 2006) aff'd 278 Fed. App'x 699, 700 (8th Cir. 2008) (unpublished per curiam) (decision by prison physicians not to continue prisoner on narcotic pain medications prescribed by plaintiff's private physician prior to incarceration was a mere disagreement over treatment decisions that did not rise to the level of a constitutional violation); Toney v. Hakala, 2013 WL 5406448 at **4, 19 (administration of non-narcotic pain medications for chronic back and neck pain reported in some instances as being 5 on a 10-point scale and increasing to 8 with activity was not deliberate indifference).

Moreover, even if defendants erred in their assessment of Rummer's pain complaints, there is insufficient evidence of criminal recklessness. In fact, the extensive efforts made by Dr. Hagan to address Rummer's pain complaints in terms of referring him to outside specialists, trying injections, and adjusting his medications are to the contrary, and the other two personally-named defendants could reasonably rely upon his judgment with respect to this issue. See, e.g., Logan v. Clarke, 119 F.3d at 649-50 (prisoner could not expect the elimination of all chronic pain and the prescription of alternative non-narcotic pain medications was not deliberate indifference); Toney v. Hakala, supra.

## IV.    RETALIATION CLAIMS

Rummer alleges that Warden Schmalenberger retaliated against him after he "was overheard stating that he planned to sue for the March 6, 2010 accident to another NDSP employee." (Doc. No. 8, p. 14). He alleges that Schmalenberger's retaliatory actions included (1) ordering a search of his cell and (2) disciplining him after fabricating an escape charge based on the items recovered during the cell search. (Id.).

### A.    Additional background

The following facts are either undisputed or stated most favorably for Rummer. Schmalenberger became Warden of the NDSP in May 2010. (Doc. No. 69-1, ¶ 2). The cell search about which Rummer complains occurred on July 30, 2010. (Doc. Nos. 69-1, ¶ 6; 79, pp. 10-11). During the search, NDSP officials found several items of contraband. An Incident Report completed by an NDSP official following the search described the items as follows:

> While searching through manilla envelopes that were on his bottom wall shelf, away from the cell bars, I found a piece of sandpaper from RRI [Rough Rider Industries]. Also, in a cup on his desk, away from his cell bars, I found two thick carpentar's [sic] pencils from RRI and two more in his desk drawer, for a total of four. While

47

x-raying his property, I found twelve loose razor blades hidden in various items. Seven were found in a "German-English Dictionary." The blades were pushed deep in the binding and were difficult to get out. One razor we were not able to remove from the book. One razor was pushed deep into the binding of the book "German: Learning To Speak and Write It." Another two razors were pushed into the binding of a third book, one of which the blade could not be retrieved. Two more blades were found in the binding of an altered legal pad. Each individual page had been removed from the legal pad and the binding pulled apart. The blades were then placed in the binding and the pages stacked neatly. The binding was then rewrapped around the pages and secured with staples. In an unopened pack of loose leaf paper, Kunkel's [Rummer's] old NDSP Inmate ID and old Wyoming State Penitentiary Inmate ID was found. The ID's were cut into three pieces each and the pictures were kept whole. The packaging of the loose leaf paper had a small 1 inch cut in the top and ID's were slid into the middle of the papers. In a box of arts and crafts, mixed in the middle of large stack of metal arts and crafts rings, I found a flat piece of hard metal approximately 6"x1". In a red folder filled with newspaper clippings, I found a roll of black electrical tape that had been flattened out. Finally, in a deck of cards, in the bottom of the box, I found a ball of copper wire.

(Doc. No. 69-15, p.1). In addition to the items described above, NDSP officials found five homemade pouches, a strip of canvas, and a pair of altered sweatpants with an extra pocket sewn on the inside. (Doc. No. 69-16). The Incident Report alleged Rummer committed three violations including (1) A-8 Trafficking/Smuggling in contraband; (2) A-51 Destruction, altercation or misuse of state/personal property; and (3) A-52 Manufacture and/or possession contraband (miscellaneous). (Doc. No. 69-15, p. 1).[11]

On August 2, 2010, Rummer received a copy of the Incident Report and a Notice of Disciplinary Hearing. (Id. at pp. 3-5). On August 9, 2010, the Adjustment Committee ("Committee") held the hearing. (Id. at pp. 1-2). Rummer provided the Committee written

---

[11] In Rummer's complaint, he states he was charged with "escape." However, it is clear from the summary judgment briefing that the disciplinary charges about which Rummer complains are the three charges listed in the Incident Report completed following the July 30, 2010 cell search. Rummer's reference to an "escape" charge is likely the result of Acting Warden Patrick Branson's decision denying Rummer's appeal of the disciplinary decision, in which Branson stated, "Every item in your possession in this incident could easily be treated as escape paraphernalia." (Doc. No. 69-19).

comments in which he acknowledged, "The report is accurate." (Id. at p.1). He also provided explanations for why he possessed the items. For example, regarding the identification cards, he explained, "I was going to cut up the ID and throw them away but I cut them up and had to be somewhere so I stuck them into the paper. They were together when I cut them. I was only going to destroy them." (Id. at p. 2). He explained that he concealed the razor blades in the book bindings and failed to advise the officers conducting the search they were there because, "I use the razor blades to cut things and you do not want to cut yourself so you put them somewhere and then you cannot remember where." (Id.). On the day of the hearing, the Adjustment Committee found that Rummer committed the three alleged violations and recommended that he be required to serve 15 days of disciplinary detention in administrative segregation, lose one month of good time, lose his job, and lose performance based sentenced reduction and weekday afternoon recreation until he was reemployed. (Id.). That same day, Warden Schmalenberger approved the Adjustment Committee's recommendation. (Id.). On August 11, 2010, Rummer appealed the disciplinary decision to the Warden. (Doc. No. 69-18). On August 12, 2010, "Acting Warden" Patrick Branson denied the appeal. (Doc. No. 69-19).

**B.** **Discussion**

Inmates have the right to be free from retaliation for exercising their First Amendment rights, and retaliatory acts by prison officials may give rise to a § 1983 claim. E.g., Santiago v. Blair, 707 F.3d 984, 991 (8th Cir. 2013); Moore v. Plaster, 266 F.3d 928, 931 (8th Cir. 2001). To prevail on a § 1983 retaliation claim, an inmate must show "(1) that he engaged in a protected activity;[12] (2)

_____

[12] Schmalenberger has not argued that Rummer's alleged threats to file a lawsuit were not "protected activity." While it is clear that the actual filing of an inmate lawsuit is protected First Amendment activity, see, e.g., Lewis v. Jacks, 486 F.3d 1025, 1029 (8th Cir. 2007), it is unclear whether _threatening_ to file a lawsuit is protected activity sufficient to support a retaliation claim. It is not clear whether the Eighth Circuit has addressed the issue, and the courts

that the government official took adverse action against him that would chill a person of ordinary

firmness from continuing in the activity; and (3) that the adverse action was motivated at least in part

by the exercise of the protected activity." Santiago, 707 F.3d at 991 (quoting Revels v. Vincenz, 382

F.3d 870, 876 (8th Cir. 2004)).

Prison officials may defend against retaliatory discipline claims by showing "some evidence"

that the inmate violated a prison rule. E.g., Sanders v. Hobbs, 773 F.3d 186, 190 (8th Cir. 2014).

The Eighth Circuit recently described the "some evidence rule" as follows:

> "[C]laims of retaliation fail if the alleged retaliatory conduct violations were issued
> for the actual violation of a prison rule." [Hartsfield v. Nichols, 511 F.3d 826, 829
> (8th Cir. 2008)]. As such, "a defendant may successfully defend a retaliatory
> discipline claim by showing 'some evidence' the inmate actually committed a rule
> violation." Hartsfield, 511 F.3d at 829. "[A] report from a correctional officer, even
> if disputed by the inmate and supported by no other evidence, legally suffices as
> 'some evidence' upon which to base a prison disciplinary violation, if the violation
> is found by an impartial decisionmaker." Id. at 831 (emphasis added). Thus, when
> there is a disciplinary decision affirming the charge, the "critical inquiry 'is not
> whether the prisoner alleges that prison officials retaliated against him for
> participating in constitutionally protected activity, but instead is whether the prison
> disciplinary committee ultimately found based upon some evidence that the prisoner
> committed the charged violation of the prison regulations.'" Cornell v. Woods, 69
> F.3d 1383, 1389 (8th Cir. 1995) (quoting Henderson v. Baird, 29 F.3d 464, 469 (8th
> Cir. 1994)). If the disciplinary decision is supported by "some evidence," the filing
> of the charge may not be the basis for a retaliatory-discipline claim. See, e.g.,
> Santiago v. Blair, 707 F.3d 984, 993 (8th Cir. 2013); Moore v. Plaster, 266 F.3d 928,
> 931 (8th Cir. 2001); Henderson, 29 F.3d at 469 (holding that a disciplinary decision
> affirming a charge "checkmates [a] retaliation claim"); Tatum v. Harmon, 402 Fed.
> App'x 158, 159-60 (8th Cir. 2010).

Sanders, 773 F.3d at 190. The "some evidence" rule does not apply to claims that an inmate was

improperly subjected to a non-disciplinary adverse action. Spencer v. Jackson County Missouri, 738

F.3d 907 (8th Cir. 2013).

---

that have considered it have reached mixed results. See, e.g., Gibson v. Fischer, No. 9:10-cv-0968 LEK/TWD, 2014
WL 7178346, at *15-16 (N.D.N.Y. Dec. 15, 2014) (noting that courts have split as to whether threatening to file a
grievance is protected activity and collecting cases).

### 1.    Retaliatory cell search claim

Schmalenberger argues that Rummer's claim that she retaliated against him by ordering the search of his cell should be dismissed because she did not order the search.  She supports her argument with an affidavit in which she states (1) that she "did not give any directive for Rummer's cell to be searched, " (2) that the decision to search the cell was made by the officers on duty, and (3) that she "did not meet Rummer or learn he was threatening a lawsuit until months after the July 30, 2010 search was conducted."  (Doc. No. 69-1, ¶¶ 6, 10, 12).  Schmalenberger further states that the officers decided to conduct the random search of Rummer's cell because he is considered a high risk for escape because he is serving a life sentence, and, as a result, his property is typically x-rayed at least once per year.  (Id. at ¶¶ 4-6).  Rummer alleges in his complaint that he "was overheard stating that he planned to sue for the March 6, 2010 accident to another NDSP employee" and that Schmalenberger ordered the cell search.  (Doc. No. 8, p. 14).  However, in his response to the pending motion for summary judgment, he does not attempt refute the assertions in Schmalenberger's affidavit.  Further, the evidence he has presented is insufficient to support a conclusion that Schmalenberger was aware that he was intending on suing for his slip-and-fall.

To prevail on his § 1983 claim, Rummer must show that Schmalenberger was personally involved in or directly responsible for the alleged constitutional violation.  See Martin v. Sargent, 780 F.2d 1334, 1338 (8th Cir.1985); cf. Rustan v. Rasmussen, No. 99-3283, 2000 WL 227987, at *1, 208 F.3d 218 (8th Cir. 2000) (unpublished per curiam) (citing Martin in affirming summary judgment dismissing retaliatory transfer claim because inmate failed to rebut defendants' evidence that they had no part in transfer decision).  This he has failed to do.

## 2. Retaliatory discipline claim

Schmalenberger argues that Rummer's retaliatory discipline claim should be dismissed for several reasons, including the fact that items discovered in Rummer's cell constitute "some evidence" that Rummer actually violated an NDSP rule. Rummer does not deny that the items described in the incident report were in his cell or that those items belonged to him. Rather, he argues that the charged violations were not warranted based on the items discovered, which he characterizes as "hobby items."

Rummer supports his argument with a number of documents. (Doc. No. 80, Exs. P-101A to P-101R & P-102A to P-102B). He submits fourteen "Cell Check/Items Pulled" reports dated between September 19, 2006 and May 7, 2010, which he argues show that he possessed items similar to those he was disciplined for possessing on several occasions prior to July 30, 2010. (Doc. No. 80, Exs. P-101A to P-101R). He asserts that he was not disciplined for possessing the items identified in the "Cell Check/Items Pulled" reports and that the timing of the July 30, 2010 search, "a mere 5 days before the knee surgery, as the Plaintiff openly pursued a lawsuit due to his injury," tends to show that "the same items [were] arbitrarily labeled as contraband on July 30, 2010[.]" (Doc. No. 79, p. 11).

Rummer also relies on an Incident Report issued and documentation of a disciplinary hearing held after a loose razor blade was found taped to the bottom of his cell door on April 22, 2013, which he calls "[t]he icing on the cake in regards to the retaliatory claim[.]" (Doc. Nos. 79, p. 11; 80, P-102A to P-102B). In that Incident Report, he was charged with violation code "234 Manu or poss of contraband that could pose a serious threat to [the] safety or security of the facility." (Doc. No. 80, Ex. P-102A). Rummer submitted written comments for the resulting disciplinary

proceedings in which he asserted the Incident Report was inaccurate, denied knowing anything about the razor blade, and challenged NDSP staff to "[b]ring on the polygraph." (Doc. No. 80, Ex. P-102B). Prison officials concluded that Rummer committed the charged violation and that the appropriate sanction was a written warning given that "20 other residents had regular access to the area and other loose razor blades were found in the EU in that area on that tier only." (Id.). Rummer asserts that the difference in severity between discipline imposed for the July 30, 2010 and April 22, 2013 incidents, which he characterizes as "identical disciplinary report[s] for razor blades," tends to show that the more severe discipline imposed in 2010 was a retaliatory attempt to prevent him from filing a lawsuit, while the less severe written warning issued in 2013 was given because this suit had already been filed "so locking Plaintiff back up into solitary confinement, was obviously fruitless." (Doc. No. 79, pp.12-13).

All of this does not make a difference. Schmalenberger is entitled to dismissal of the retaliatory discipline claim because the items discovered during the July 30, 2010 cell search – which Rummer does not deny possessing – clearly constituted "some evidence" that Rummer committed the three violations charged in the resulting Incident Report.[13] Consequently, Rummer's retaliatory discipline claim fails.

_____

[13] Although no further discussion of Rummer's arguments is required, Rummer's contentions regarding the inconsistencies in disciplinary outcomes following the July 30, 2010 cell search and other cell searches are without merit. While the "Cell Check/Items Pulled" reports show that unauthorized items had been removed from Rummer's cell on a number of other occasions, they also show that the items recovered during those cell checks were of a significantly different nature than the items discover during the July 30, 2010 search. The majority of the "items pulled" were linens, clothing, writing utensils, office supplies, CDs, food items, and empty food and toiletry containers. A single altered razor blade was recovered on one occasion. (Doc. No. 80, P101-F). Rummer's description of the items recovered during the other searches as identical to the items discovered during the July 30, 2010, is disingenuous at best. The differences between the items and the reasons prison officials would determine the items recovered on July 30, 2010, warranted a more serious punishment are obvious.

## V.     THE TORTURE VICTIM PROTECTION ACT

In Rummer's response to defendants' motion for summary judgment, he references the Torture Victim Protection Act of 1991 ("TVPA"), 106 Stat. 73 (note following 28 U.S.C. § 1350). (Doc. No. 79, pp. 14-18). No claim for a violation of this Act was included in Rummer's complaint, however, and it was not included in the claims the court allowed to go forward in its § 1915A screening order. Consequently, if Rummer is attempting to make a claim under this Act now, it is too late. Also, the Act, on its face, does not apply.

## VI.     RECOMMENDATION

For the reasons stated above, it is **RECOMMENDED** that defendants' motion for summary judgment (Doc. No. 68) be **GRANTED** and that Rummer's complaint (Doc. No. 8) be **DISMISSED WITH PREJUDICE**.

### NOTICE OF RIGHT TO FILE OBJECTIONS

Pursuant to D.N.D. Civil L.R. 72.1(D)(3), any party may object to this recommendation within fourteen (14) days after being served with a copy of this Report and Recommendation. Failure to file appropriate objections may result in the recommended action being taken without further notice or opportunity to respond.

Dated this 28th day of September, 2015.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court